IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JORGE LUJAN,

        Plaintiff,

        vs.                   Case No. 10-4023-JTM

EXIDE TECHNOLOGIES,

        Defendant.

MEMORANDUM AND ORDER

This matter comes before the court on defendant, Exide Technologies's Motion for Summary Judgment (Dkt. No. 84). The court held oral argument on the motion on January 30, 2012, and took the matter under advisement.

Exide fired the plaintiff, Jorge Lujan, not long after a doctor placed permanent work restrictions on him for his shoulder injury. Exide contends Mr. Lujan's work restrictions made it impossible for him to perform his job. At issue is whether Mr. Lujan has produced enough evidence to submit his workers compensation retaliation, Family Medical Leave Act (FMLA) retaliation, and FMLA interference claims to a jury. This court holds that he has not. Mr. Lujan cannot show that Exide's stated reason for terminating him was pretextual. And he exhausted his FMLA leave eligibility prior to his termination. Additionally, for the reasons stated herein, the court grants Exide's Motion to Exclude Plaintiff's Expert Witnesses (Dkt. No. 93) and denies as moot Exide's Motion to Strike Affidavit of Karl Sneath or, Alternatively, to Take Mr. Sneath's Deposition (Dkt.

No. 91).

## I. Uncontroverted Facts

Before reciting the facts of this case, this court must once again admonish Mr. Lujan's counsel for failing to follow the local rules and the Federal Rules of Civil Procedure when responding to and presenting facts at summary judgment. This is at least the seventh time this court has had to admonish plaintiff's counsel about precisely this failure. *See Coleman v. Blue Cross Blue Shield of Kan.*, 487 F. Supp.2d 1225 (D. Kan. 2007); *Boldridge v. Tyson Foods, Inc.*, No. 05-4055, 2007 WL 1299197, at *1 (D. Kan. May 2, 2007), *aff'd*, 280 Fed. App'x 723 (10th Cir. 2008); *Ney v. City of Hoisington, Kan.*, 508 F. Supp.2d 877 (D. Kan. 2007), *aff'd*, 264 Fed. App'x 678 (10th Cir. 2008); *Rojo v. IBP, Inc.*, No. 02-4112-JAR, 2007 WL 593637 (D. Kan. Feb. 21, 2007), *aff'd*, 278 Fed. App'x 850 (10th Cir. 2008); *Satterlee v. Allen Press, Inc.*, 455 F. Supp.2d 1236 (D. Kan. 2006). Local Rule 56.1(b)(1), and (d) specifically provides:

> **(b)(1) Opposing Memorandum**. A memorandum in opposition to a motion for summary judgment must begin with a section containing a concise statement of material facts as to which the party contends a genuine issue exists. Each fact in dispute must be numbered by paragraph, refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed.

> **(d) Presentation of Factual Material**. All facts on which a motion or opposition is based must be presented by affidavit, declaration under penalty of perjury, and/or relevant portions of pleadings, depositions, answers to interrogatories, and responses to requests for admission. Affidavits or declarations must be made on personal knowledge and by a person competent to testify to the facts stated that are admissible into evidence. Where facts referred to in an affidavit or declaration are contained in another document, such as a deposition, interrogatory answer, or admission, a copy of the relevant excerpt from the document must be attached.

To controvert Exide's factual statement, it is not proper to simply state that a fact is controverted or

to add additional irrelevant facts. *See Coleman*, 487 F. Supp.2d at 1235-36, n.23. The proper place for additional facts is in a separate section in a memorandum in opposition to summary judgment. *See* D. KAN. R. 56.1(b)(1). There are frequent instances in plaintiff's brief in which the cited testimony does not reflect the proposition asserted, or even reflects the opposite proposition. Counsel also commonly states legal conclusions as facts. In none of these instances has plaintiff's counsel properly controverted Exide's facts; thus, many are deemed admitted.[1]

*A. Mr. Lujan's Injury*

Exide manufactures and distributes batteries of all sizes up to 80 pounds at its plant in Salina, Kansas. Mr. Lujan began working for Exide at the Salina plant in May 2002. From that time, until his termination on March 13, 2008, he held the position of COS Operator (case on strap loader). Among other things, the job description for the COS Operator position states that "[e]mployee is required to repetitiously lift and handle battery parts, elements and batteries weighing from grams to 80 pounds," and also "[r]epetitious lifting of 3-5 pounds." Dkt. No. 85, Ex. 5. As a COS Operator, Mr. Lujan had to lift "lead pigs" or lead bars, weighing 60 to 70 pounds, and also had to lift molds weighing in excess of 75 pounds, without help from equipment.

On December 3, 2006, Mr. Lujan injured his left shoulder while he was lifting the lead bars. In January 2007, Mr. Lujan was evaluated by Dr. John Richards, who diagnosed him with a shoulder strain. Dr. Richards placed Mr. Lujan on "light duty" and told him not to lift lead bars. He also prescribed physical therapy and over-the-counter pain relievers. Mr. Lujan began physical therapy

---

[1]The court also notes that plaintiff's counsel's inability or unwillingness to follow the rules not only causes the court extra work, it does a disservice to the client.

but still had shoulder pain when he returned on February 8. On February 20, Dr. Richards ordered x-rays of Mr. Lujan's shoulder and neck and placed him on full work restriction until further evaluation. By March 6, the pain had not subsided and Mr. Lujan continued on full work restriction. By referral, Mr. Lujan went to an orthopedic clinic on March 13. The clinic doctor ordered an MRI of his shoulder and relaxed his full work restriction to allow him to lift up to 25 pounds, but restricted any overhead work.

On March 20, Mr. Lujan filed a formal workers compensation claim. On March 29, the clinic doctor noted that he was "debilitated" and "not working at this point due to his restrictions." Dkt. No. 85, Ex. 15. And the doctor increased his work restriction to only using his right arm. A few weeks later the same doctor recommended shoulder surgery. On June 12, Dr. Craig Satterlee performed Mr. Lujan's shoulder surgery and placed him on full work restriction. On July 26, Dr. Satterlee released Mr. Lujan to return to light duty under a partial work restriction requiring him not to lift any weight. This restriction was amended on September 10, so that he could lift no more than 10 pounds above horizontal. Dr. Satterlee last treated Mr. Lujan on October 15, 2007, in which he summarized Mr. Lujan's recovery and placed him on the following restriction:

> He comes in today. His shoulder is doing well. He is able to lift 60 pounds in therapy. His active elevation is 180, external rotation is 70, internal rotation is T9. He is having troubles with his neck. He says it is episodic. It comes and goes. He has had evaluation and treatment of it with Dr. Johnson before. We discussed as far as his shoulder goes, I think he is at maximum medical improvement. *We could probably release him without any restrictions, but I will keep him on a 60 pound lifting restriction because of his neck* and we should have him follow up with one of the neck specialists either here or at home. We will see if those arrangements can be made for him.

Dkt. No. 85, Ex. 26 (emphasis added). Thereafter, Mr. Lujan returned to his COS Operator job, but worked under Dr. Satterlee's 60-pound restriction. This restriction allowed him to continue working

in his normal position, however, other employees had to lift the lead bars and molds for him.

Dr. Satterlee also referred Mr. Lujan to neurologist Dr. Paul Stein for his neck problems. On January 11, 2008, Dr. Stein examined Mr. Lujan and summarized Mr. Lujan's current status as: "Pain is present in the left side of the neck, the left trapezius, and the left shoulder. There is pain across the left shoulder blade and some into the upper arm. On a scale of 0-10, the pain ranges from 5 to 8." Dkt. No. 85, Ex. 29, pg. 2. Mr. Lujan also told him that the pain "will sometimes awaken him at night." *Id.* at pg. 3. Dr. Stein summarized his conclusions as follows: "Mr. Lujan sustained injury to the left shoulder at work on 12/3/06. He is at maximum medical improvement for the shoulder injury. . . . Total left upper extremity impairment is 19% documented." *Id.* at pg. 5. He placed permanent work restrictions on Mr. Lujan's shoulder including:

1. Avoid lifting more than 30 pounds with the left hand up to chest level.
2. Avoid repetitive work activity with the left-hand above shoulder level.
3. Avoid repetitive activity with the left-hand extended backward.
4. Avoid repetitive activity with the left-hand fully outstretched.

*Id.* Dr. Stein also stated that further investigation was needed "to rule out the possibility of nerve root impingement or peripheral nerve entrapment." *Id.* Exide received a copy of the report on February 6, 2008. On February 7, Mr. Lujan had an MRI and EMG/NCT imaging study performed on his neck. Dr. Stein concluded the imaging studies were normal and that Mr. Lujan had no neck impairment. In early March, Exide received notice that Mr. Lujan's neck was normal. Throughout Mr. Lujan's medical troubles, Exide or its workers compensation insurer covered the cost of all his medical treatment.

Jayne Cornish is Exide's Human Resources Manager. After receiving Dr. Stein's report on February 6, she undertook the process of determining whether the permanent work restrictions

5

imposed by Dr. Stein would allow Mr. Lujan to continue performing his job as a COS Operator. Ms. Cornish determined that the requirements of that job were inconsistent with Mr. Lujan's maximum weight and repetitive motion restrictions, thus, she concluded Mr. Lujan could no longer work as a COS Operator. Ms. Cornish also reviewed the job descriptions of other open jobs at Exide to determine whether Mr. Lujan might be able to perform another job at the company. The open and available jobs were Plaque Room Worker, Stacker/Wrapper (three positions available), Unloader, Material Handler, and Assembler. All of the jobs required lifting in excess of the weight restrictions placed on Mr. Lujan by Dr. Stein. After reviewing these jobs, Ms. Cornish determined Mr. Lujan could not perform them because of his work restrictions.

Even though no jobs were available for Mr. Lujan at Exide, Ms. Cornish directed Human Resources Clerk, Darelynn Smith to review the job descriptions of all the jobs at the plant, whether open or not. Ms. Smith found two jobs consistent with Mr. Lujan's restrictions—Grid Caster and Excel Champion. But these jobs were not available on March 11, 2008. Regardless, Ms. Cornish determined Mr. Lujan was not qualified for the Excel Champion job because he lacked the necessary computer skills, and written and verbal English skills. She made this determination based on her personal knowledge that Mr. Lujan needed a translator and his employee file contained no record of computer skills. Further, the Excel Champion job required people seeking the job to interview for it. As for the Grid Caster job, Ms. Cornish talked to Rick Crouse, an Exide manager familiar with the job, and he informed her the job required repetitive activity inconsistent with Mr. Lujan's restrictions. Thus, Ms. Cornish determined that even if the job was available, Mr. Lujan could not perform it.

At that point, Exide contends it decided to terminate Mr. Lujan because his permanent

restrictions precluded him from performing the COS Operator job or any other available jobs at the plant. But before notifying Mr. Lujan, Ms. Cornish consulted plant manager John Pfeiffer. Because no jobs consistent with his restrictions were available, Mr. Pfeiffer agreed with her decision. On March 13, 2008, Ms. Cornish gave Mr. Lujan a letter telling him he had been fired because his work restrictions precluded him from performing any available jobs at Exide. Ms. Cornish told Mr. Lujan that Exide "had received permanent restrictions from the doctor, and that after reviewing the jobs and what we had available, we did not have any jobs that met his restrictions." Dkt. No. 85, Ex. 25, pg. 115.

Mr. Lujan testified that after he was injured, his supervisors made fun of him and his injury. Specifically, he testified:

Q: And when did you tell them you thought you were being retaliated against?

A: When the supervisor and the lead man would make fun of me at work.

Q: Who was the supervisor that you were talking about?

A: Greg Gordon and Robert Penn.

Q: And what would they do to make fun of you?

A: They would grab their shoulder and laugh like a little girl. It's – it's not easy with everybody there, putting up with the situation when they're making fun of you.

Q: I'm asking you what they did to make fun of you. They grabbed their shoulder. What else?

A: And they would laugh. When I would have to go to therapy, I'd tell them, "I got to go to therapy" and they said, "Go, You're not important here anyways."

. . .

Q: Anyone else who you believed treated you unfairly or illegally at Exide?

7

A: I remember another supervisor, Mike Wilson. The time that they'd leave and we enter – when we'd leave and they'd enter, he said, "Oh, you still work here?"

. . .

Q: What about their treatment caused you embarrassment or humiliation?

A: The way they would make fun of me. I don't like to remember because I get more –I feel bad. I try to talk the least I can on that.

Q: What is it about your treatment at Exide that cause you to be embarrassed or humiliated? Just the – the making fun of you by your supervisors?

A: Yes. The way the supervisor made fun of me and the way I was fired. There's like no privacy once a supervisor finds something out. Then the others find out and they make comments about it.

Q: Anything else that's caused you embarrassment or humiliation about your dealings with Exide?

A: Well, just that. They made fun of me, and –and the same thing. That, and they made fun of me.

Dkt. No. 89, Ex. A, pgs. 163-64, 176, 192-93. Additionally, he testified that Ms. Cornish made fun

of him when she fired him:

Q: Do you recall the day that you were terminated – your employment was terminated by Exide?

A: Do I remember the day they fired me?

Q: Yes.

A: Yes.

Q: What do you remember about that day?

A: They called me – they called me on a Thursday to go to the personnel office. I remember that the person there in personnel was kind of making fun of me.

Q: Who – who was that?

8

A: Her (indicating)

Q: You're referring to Ms. Cornish?

A: Yes.

Q: What was – what was she doing that you felt was making fun of you?

A: Because I took another person with me and she was making fun of me, asking me did I bring an interpreter.

Q: Why did you take that to be her making fun of you?

A: Because she was laughing.

. . .

Q: Any other reason why you felt Ms. Cornish was making fun of you?

A: Well, that – when I asked her "Are you firing me," she was kind of laughing. You know when – you know when someone's making fun of you.

Q: So you asked her if she was firing you, is that correct?

A: Yes.

Q: And you believe that she was laughing?

A: She was laughing.

Dkt. No. 89, Ex. A, pgs. 146-48. Mr. Lujan also testified that he "could work." But he never unequivocally stated that he could do his job within the restrictions placed upon him.

### B. Mr. Lujan's Workers Compensation Case

After Exide fired Mr. Lujan, he was evaluated by Dr. Sergio Delgado as part of his ongoing workers compensation case. In a written report sent to Mr. Lujan's counsel on May 28, 2008, Dr. Delgado stated that Mr. Lujan was complaining of pain in his left shoulder and neck, as well as

numbness. Dr. Delgado concluded that the pain was "aggravated by activities such as use of the left arm for pushing, pulling, lifting and particularly overhead work." Dkt. No. 85, Ex. 46, pg. 3. Like Dr. Stein, Dr. Delgado concluded that Mr. Lujan had a permanent partial impairment to his left shoulder and had permanent work restrictions related to lifting and repetitive motion. In further support of his workers compensation case, Mr. Lujan obtained a letter from his surgeon, Dr. Satterlee, who stated "[t]he permanent partial impairment of [Mr. Lujan] is fourteen percent (14%) of the left shoulder." Dkt. No. 85, Ex. 48 (alterations added). On September 10, 2008, a Kansas workers compensation judge approved an agreed award for permanent partial impairment in Mr. Lujan's workers compensation case. Mr. Lujan and his attorney signed the award. In the award, the judge found that Mr. Lujan had a permanent impairment of his shoulder of 17.67% and awarded him $38,428.36 for temporary total and permanent partial impairment. In the award, Mr. Lujan stipulated that: "If Claimant were to testify, the testimony would be consistent with the information set out in the reports of Dr. Paul Stein dated January 11, 2008 and Dr. C. Craig Satterlee dated June 3, 2008 including the history of injuries set out therein." Dkt. No. 85, Ex. 49, pg. 2.

### C. Exide's FMLA Policies

Exide requires that FMLA leave run concurrently with any other form of medical or disability leave. Further, Exide uses a rolling 12-month period for calculating whether its employees have accrued the requisite 1,250 hours of service necessary for FMLA leave. Mr. Lujan went on full medical leave on March 16, 2007. He did not return to work until July 29, 2007, a period of approximately 19 weeks. During that period, Exide placed Mr. Lujan on FMLA leave but did not notify him. After he returned to work, he did not accrue 1,250 hours of service prior to getting fired

on March 13, 2008.

   *D. Mr. Lujan's Affidavit*

   Exide also contends that this court should strike Mr. Lujan's affidavit, submitted as Exhibit N to his Response because it falls under the sham affidavit rule. *See Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986). This rule provides that "'an affidavit may not be disregarded [solely] because it conflicts with the affiant's prior sworn statements. In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue.'" *The Law Co., Inc., v. Mowhawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1169 (10th Cir. 2009) (quoting *Franks*, 796 F.2d at 1237). In determining whether an affidavit is a sham, the Tenth Circuit has directed the district courts to consider whether "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* (quoting *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001)). A district court must first "'determine whether the conflicting affidavit is simply an attempt to create a 'sham issue of fact' before excluding it from summary judgment consideration.'" *Id.* (quoting *Durtsche v. Am. Colloid Co.*, 958 F.2d 1007, 1010 n.2 (10th Cir. 1992)).

   Mr. Lujan submitted his affidavit on September 16, 2011. He was deposed on September 28, 2010. Mr. Lujan's deposition testimony provides, in part:

   Q. Okay. And the plates that you're lifting, are those what you refer to as lead bars,

11

or is that something different?

A. What?

Q. Lead bars?

A. You had to lift those up too.

Q. Okay. That's different than the plates?

A. It's at the same -- it's the same
process.

Q. What do you do with the lead bars?

A. I would put them in the pan of the lead, and every time that I needed the lead pans,
I would push them in there.

. . .

Q. Okay. And you have to put the lead bars on the line?

A. Yes, I -- I did have to do that.

. . .

Q. Would you agree that you have to repeatedly lift battery parts?

A. Lift the parts?

Q. Yes.

A. I have to lift the lead.

. . .

Q. Okay. What else do you lift other than the lead bars? Is there anything else that
you lift as a COS operator?

A. The plates and the lead bars.

Q. Okay. And the plates are actually part of the battery? They become part of the
battery, correct?

12

A. Yes.

Q. So you lift the plates and you lift the lead bars and you do that repeatedly over your shift?

A. Yes.

Q. And the plates come in different sizes?

A. Yes.

Q. And they are of different weight?

A. Yes.

Q. Some of them are very light? Just grams?

A. Yes.

Q. And some of them are very heavy? Up to 80 pounds?

A. No.

Q. How much do the lead bars weigh?

A. 60.

Q. Okay. How do you know that?

A. Because they will say.

Q. Where does it say?

A. They said it there that that – that's how much they weighed.

Q. Is it possible that they -- that some of them weigh up to 80 pounds?

A. It could be.

. . .

Q. What happened on the day that you were injured?

A. I lifted a bar, I felt some pain, and that's it.

Dkt. No. 99, Ex. 55, pgs. 52-57, 59. Exide objects to the following paragraphs of the affidavit:

> 10. Defendant manufacturer's [sic] mostly small batteries including motorcycle batteries which during the manufacturing process are basically plastic cells that do not weigh very much. Even the occasional large batteries do not weigh much before they are filled with liquid. During the manufacturing process, all batteries are plastic and cells are very light. Further, all work at Exide's plant is automated with minimal physical demands and do not require repetitive or heavy lifting.

> 11. The lead bars are not lifted. Lead bars are transferred from a stand a couple of feet away into a furnace. In addition, this is an activity that is done only a few times throughout the day. The same is true with the molds. In my deposition I talked about lifting. However, because the bars are about the same level as the furnace, a more appropriate description of the job activity is transfer of lead bars.

> 12. On the date of my injury, December 3, 2006, I tripped and in the process of almost falling down while holding a lead bar I injured my left shoulder.

Dkt. No. 89, Ex. N.

Exide argues these paragraphs should be stricken because they are inconsistent with Mr. Lujan's deposition testimony and are offered only to create a genuine issue of material fact where none exists. Plaintiff's counsel objected to the form of a few of the deposition questions, but he did not cross examine Mr. Lujan on these issues. Mr. Lujan's characterization of the battery weights in his affidavit does not necessarily contradict his deposition testimony that they weighed 60 pounds. Further, whether Mr. Lujan lifted or "transferred" the lead bars is more of a semantic issue than one of creating a sham issue of fact. Last, even though Mr. Lujan's reason for his injury is different in his deposition and affidavit, this fails to create a genuine issue on any material fact. For these reasons, the court declines to disregard Mr. Lujan's affidavit.

## II. Summary Judgement Standard

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." FED. R. CIV. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact." *Id.* Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hosp.*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Nat. Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985). The moving party need not disprove [nonmovant's] claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987) (alterations added).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Id.* Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative. *Id.* at 250-51. Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

15

*Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)) (emphasis in *Matsushita*).

Finally, the court reminds the parties that summary judgment is not a "disfavored procedural shortcut." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). It is an important procedural vehicle "designed to secure the just, speedy and inexpensive determination of every action." *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Id.*

## III. Conclusions of Law

### A. Workers Compensation Retaliation and FMLA Retaliation

Mr. Lujan's first claim is one for worker's compensation retaliation in violation of Kansas law. "'Retaliatory discharge cases must generally be proven by circumstantial rather than direct evidence because rarely will an employer admit to having discharged an employee in retaliation for exercising a right.'" *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002) (quoting *Chaparro v. IBP, Inc.*, 873 F. Supp. 1465, 1472 (D. Kan. 1995), *aff'd*, 104 F.3d 367 (10th Cir. 1996)). Thus, at the summary judgment stage, Kansas courts have adopted the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework to evaluate claims of worker's compensation retaliation. *See Hysten v. Burlington Northern Santa Fe Ry. Co.*, 372 F. Supp.2d 1246, 1253 (D. Kan. 2005). Under *McDonnell Douglas*, Mr. Lujan must first establish a prima facie case of retaliatory discharge.

16

To establish a prima facie case for retaliatory discharge, Mr. Lujan must show: "(1) The plaintiff filed a claim for workers compensation benefits or sustained an injury for which he or she might assert a future claim for such benefits; (2) the employer had knowledge of the plaintiff's workers compensation claim injury; (3) the employer terminated the plaintiff's employment; and (4) a causal connection existed between the protected activity or injury and the termination." *See Rebarchek v. Farmers Co-op Elevator*, 272 Kan. 546, 554, 35 P.3d 892, 899 (2001). Mr. Lujan's FMLA retaliation claim is also subject to the *McDonnell Douglas* burden-shifting framework. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1170 (10th Cir. 2006). To establish a prima facie case of FMLA retaliation, Mr. Lujan must show that: (1) he exercised a protected right under the FMLA; (2) Exide took an action that a reasonable employee would have found materially adverse; and (3) a causal connection exists between the two. *See id.* at 1171.

If a plaintiff establishes a prima facie case, the burden of production shifts "to the employer to produce a legitimate, nondiscriminatory justification for taking the disputed employment action." *Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004). "If the employer provides a legitimate, non-discriminatory justification for the action, the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for discrimination." *Id.* at 1071. To show pretext, a plaintiff must prove "by a preponderance of the evidence that the legitimate reasons proffered by defendant were not its true reasons, but were a pretext for discrimination." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008).

Mr. Lujan's burden in opposing summary judgment on his retaliation claims is to prove that he was fired "'based on, because of, motivated by or due to' Exide's intent to retaliate by a preponderance of the evidence that is "clear and convincing in nature.'" *See Foster*, 293 F.3d at 1193

17

(quoting *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998)). The Kansas Supreme Court

has defined "clear and convincing evidence" as "that which is sufficient to establish that the truth

of the facts asserted is 'highly probable.'" *In re B.D.-Y.*, 286 Kan. 686, 696, 187 P.3d 594, 601

(2008).

  Mr. Lujan argues the "clear and convincing standard" should not be applied at summary

judgment. Yet the Tenth Circuit has unequivocally held otherwise. In *Foster*, the Tenth Circuit stated

that under Kansas law, a plaintiff can prevail in a retaliatory discharge case at trial with "clear and

convincing evidence." 293 F.3d at 1194. The court also noted that Kansas law allowed a plaintiff to

oppose a motion for summary judgment by meeting the lower preponderance of the evidence

standard. *Id.* The court rejected the same approach in federal court and held that at summary

judgment a federal plaintiff "must set forth evidence of a clear and convincing nature that, if believed

by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal

retaliation by her employer." *Id* at 1195; *see also Milne v. USA Cycling, Inc.*, 575 F.3d 1120, 1128

(10th Cir. 2009). Therefore, the quality of evidence presented by Mr. Lujan must be "clear and

convincing" that, if believed, would make it more likely than not that Exide retaliated against him.

*See id.*

  Both Mr. Lujan and Exide make the same arguments respecting each of the retaliation claims.

And both are subject to the *McDonnell Douglas* burden shifting analysis. Thus, this court will

consider both claims together.


  1. Prima Facie Case

Exide does not challenge that Mr. Lujan was injured, took leave, filed a workers

18

compensation claim, and was later fired. It only argues that no causal connection exists between Mr. Lujan's workers compensation claim or him taking leave and his termination.

Most often, plaintiffs attempt to establish prima facie evidence of a causal connection by pointing to the temporal proximity between the protected activity and the termination. "'A retaliatory motive may be inferred when an adverse action closely follows protected activity. However, unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.'" *Fears v. Flying J., Inc.*, No. 09-1070, 2011 WL 98159, at *3 (D. Kan. Jan. 12, 2011) (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). The closer in time between a protected action and termination, the more likely temporal proximity supports an inference of discrimination. *See id.* The Tenth Circuit has held that adverse employment action occurring more than three months after the protected activity, alone, is not entitled to a presumption of causation. *Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002). But the passage of time will not defeat a retaliation claim if the plaintiff can offer other evidence of a retaliatory motive. *See Piercy v. Maketa*, 480 F.3d 1192, 1198-99 (10th Cir. 2007).

Here, Mr. Lujan injured his left shoulder on December 3, 2006. He began receiving medical treatment in January 2007, filed a formal workers compensation claim on March 20, 2007, and took around 19 weeks of leave from March to July 2007. Exide fired him on March 13, 2008. Accepting the date he filed his workers compensation claim as the "protected activity," there is almost one year separating that date from his termination. Also, he began taking leave about one year before Exide fired him. This significant span of time cannot support a reasonable inference of discrimination. *See, e.g.*, *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1181-82 (10th Cir. 2006) (stating nine months

19

was too remote to support an inference of discrimination); *Haynes v. Level 3 Comm'ns, L.L.C.*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding seven months between protected activity and alleged retaliatory conduct was not enough to support discrimination claim under Title VII, ADEA, and ADA); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (holding two to three month time period alone not enough to establish causation).

Mr. Lujan argues the workers compensation date is not the proper date at which to establish a causal connection. Rather, he contends a causal connection is established from the time Dr. Stein evaluated his neck in February 2008, and his termination on March 13. Essentially, his argument is as follows. Ms. Cornish knew Mr. Lujan's "principal and treating physician," Dr. Satterlee, released him with no restrictions on the shoulder in October 2007, and Exide "abides by the restrictions of the treating physician." After that, Dr. Stein only evaluated his neck, and Dr. Stein placed no restrictions on his neck in February 2008. Once Ms.Cornish learned Dr. Stein determined Mr. Lujan had no permanent injury to his neck she fired him because she knew it would not increase Exide's exposure in the workers compensation case. *See* Dkt. No. 89, pgs. 57-58. Basically, Mr. Lujan argues Exide did not fire him until it evaluated the costs of his workers compensation claim after he received a favorable determination on his neck.

First, Mr. Lujan does not cite any authority holding that a doctor's determination of an employee's injury is a "protected activity" from which the temporal proximity related to establishing a causal connection should be judged. In *Wicks v. Riley County Board of County Commissioners*, this court rejected a similar argument. 125 F. Supp.2d 1282 (D. Kan. 2000) (holding temporal proximity not measured by the date the employer may have evaluated the extent or cost of the employee's injury). Nothing in Mr. Lujan's brief persuades this court not to accept the conclusion

in *Wicks*. Further, this court has explicitly stated that temporal proximity should be measured between the date of the workers compensation claim and the termination. *See, e.g.*, *Anderson v. United Parcel Service, Inc.*, No. 09-2526, 2011 WL 4048795, at *21 (D. Kan. Sept. 13, 2011); *Robert v. Bd. of County Comm'rs of Brown County, Kan.*, No. 08-2150, 2011 WL 836729, at *10 (D. Kan. Mar. 3, 2011) (citing *Rebarchek*, 272 Kan. at 555, 35 P.3d at 899).

Mr. Lujan's remaining arguments attempting to establish a causal connection are not persuasive. Even if they were, he has failed to demonstrate that Exide's proffered reason for terminating him was pretextual. The court will address plaintiff's remaining causal connection and pretext arguments below.

### 2. Legitimate, Non-discriminatory Justification

At the second stage of the *McDonnell Douglas* burden shifting analysis, the defendant must articulate a legitimate, nondiscriminatory reason for its decision. *See Trujillo*, 524 F.3d at 1158. Ms. Cornish testified that she made the decision to fire Mr. Lujan after evaluating the permanent work restrictions placed on him by Dr. Stein and by looking at his job requirements. Therefore, Exide has articulated such a reason—it fired Mr. Lujan because his permanent work restrictions made it impossible for him to perform his job, or any other available job at Exide.

### 3. Pretext

At the third and final stage, Mr. Lujan bears the ultimate burden of showing that Exide's proffered reason for terminating him was pretextual. *See Trujillo*, 524 F.3d at 1158. "'A plaintiff can show pretext by revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'" *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1315 (10th Cir. 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1192-93 (10th Cir. 2005)). "A plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted). "[P]retext can be shown in a variety of ways, including but not limited to differential treatment of similarly situated employees and procedural irregularities. The former is 'especially relevant' where the defendant has proffered a legitimate non-discriminatory reason for the adverse employment action." *Trujillo*, 524 F.3d at 1158 (quoting *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195 n.6 (10th Cir. 2000)).

As stated above, Mr. Lujan cannot rely on temporal proximity to establish either a causal connection or pretext because Exide fired him nearly a year after he began taking leave and a year after he filed his workers compensation claim. Regardless, temporal proximity is insufficient alone to establish pretext. *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 n.6 (10th Cir. 2007); *Britvic Soft Drinks Ltd. v. ACSIS Technologies, Inc.*, 265 F. Supp.2d 1179, 1184 (D. Kan. 2003).

Next, the uncontroverted facts establish that Dr. Satterlee placed Mr. Lujan on a 60-pound lifting restriction on October 15, 2007. Dr. Satterlee stated, "[w]e could probably release him without any restrictions, but I will keep him on a 60 pound lifting restriction because of his neck and we

should have him follow up with one of the neck specialists either here or at home." Dkt. No. 85, Ex. 26. Mr. Lujan continued to work with this restriction until Dr. Stein, the neck specialist, placed him on permanent work restrictions requiring him to (1) avoid lifting more than 30 pounds and (2) to avoid repetitive work with the left hand above the shoulder, extended backward, and fully outstretched. Ms. Cornish testified that she looked at the restrictions placed on him by Dr. Stein and concluded he could not perform his job, or any other available job at Exide, and she fired him.

Mr. Lujan first attempts to show pretext by arguing Ms. Cornish ignored medical evidence and improperly relied on Dr. Stein's restrictions rather than Dr. Satterlee's restriction. Mr. Lujan contends Dr. Satterlee was his treating physician for his shoulder and that he released him to full duty on his shoulder on October 15, 2007. Although Mr. Lujan repeatedly contends Dr. Satterlee released him from any shoulder restrictions, it is clear Dr. Satterlee did not release him without restrictions. Dr. Satterlee kept Mr. Lujan on a 60 pound lifting restriction. Mr. Lujan contends Ms. Cornish should have considered this restriction only and not the subsequent restrictions placed on him by Dr. Stein because Dr. Stein was not his treating physician.

Yet when Dr. Stein examined Mr. Lujan on January 11, 2008, he was complaining of pain in his left shoulder ranging from 5-8 on a scale of 1 to 10. He even stated that the pain would sometimes awaken him at night. After his evaluation, Dr. Stein concluded Mr. Lujan required permanent restrictions to his shoulder. Ms. Cornish received this report on February 6. Thereafter, she determined whether those restrictions would allow Mr. Lujan to continue his COS Operator job, or any other available job at Exide. She concluded he could not perform his job safely within the restrictions and that no other jobs were available.

Ms. Cornish's reliance on Dr. Stein's report was not improper. Dr. Stein was the last doctor

to evaluate Mr. Lujan, and Mr. Lujan told him that he had pain in his shoulder. Further, Dr. Satterlee did not evaluate Mr. Lujan after October 15, 2007, and he specifically testified he was not aware of Mr. Lujan's condition after that time. It can be argued that Ms. Cornish should have relied on Dr. Satterlee's opinion, but that she did not does not show that Exide's termination decision was pretextual. The relevant issue in determining pretext is not whether Mr. Lujan could have performed the COS Operator job safely under Dr. Satterlee's restriction. Instead, the question is whether Exide honestly believed Mr. Lujan could not perform his job because of the permanent work restrictions imposed by Dr. Stein. *See Degraw v. Exide Technologies*, 744 F. Supp.2d 1199, 1211 (D. Kan. 2010) ("The relevant issue for the purposes of showing pretext is not whether plaintiff could have safely performed the job of material handler. Instead, it is whether defendant honestly perceived that plaintiff could not safely perform the job of material handler because of his medical condition."); *see also Metzler*, 464 F.3d at 1178 (stating a mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual). Even considering only Dr. Satterlee's restriction, Mr. Lujan was not capable of safely performing all the duties of his job as defined by the job descriptions.

Next, Mr. Lujan contends Exide's stated reason for the termination was pretextual because Ms. Cornish did not have the necessary medical training to make the decision to fire him. Yet he offers no evidence or legal precedent supporting his argument that such medical training is necessary. This court cannot fathom why Ms. Cornish would need medical training to evaluate Dr. Stein's restrictions and to determine whether they were consistent with Mr. Lujan's job requirements. The only way Mr. Lujan could potentially establish pretext in this manner would be if Exide typically used someone with medical training when making termination decisions of this

24

kind. *See, e.g.*, *Vigil v. Colo. Dep't of Higher Educ.*, 185 F.3d 876, at *7 (10th Cir. 1999) (holding "disturbing procedural irregularities" can support an inference of pretext). "But, proof of an irregularity requires proof of the standard or ordinary procedure." *Degraw*, 744 F. Supp.2d at 1219. Mr. Lujan offers no proof that Exide deviated from its standard procedure when it fired him; therefore, this argument fails to establish pretext.

Last, Mr. Lujan argues the opinions of his experts prove Exide's reason was pretextual. He contends that three of his doctors, Dr. Satterlee, Dr. Stein, and Dr. Delgado "testified [he] was capable of performing his job and other open and available jobs at Exide." Dkt. No. 89, at pg. 65. Contrary to Mr. Lujan's assertion, none of the doctors testified that he could perform the COS Operator job in 2008, or any other available job. Dr. Satterlee testified that he had no opinion as to Mr. Lujan's ability to perform any job in 2008. *See* Dkt. No. 99, Ex. 53, pgs. 28-29. Dr. Delgado testified that he would have to speculate to offer an opinion on Mr. Lujan's ability to perform any job in 2008. And Dr. Stein testified that he did not know whether the 2011 videotape accurately depicted the jobs in 2008. Mr. Lujan's contention that these doctors testified he could perform his job in 2008, is wholly inaccurate.

Regardless, none of the doctors testified about the reasonableness of Ms. Cornish's termination decision, which is the only pertinent question in establishing pretext. *See Degraw*, 744 F. Supp.2d at 1211. Further, Dr. Satterlee testified he was not aware of Dr. Stein's restriction, and Dr. Stein testified he did not take into consideration the weight of the objects being lifted in the videos. Additionally, as explained below, this court grants Exide's Motion to Exclude Dr. Satterlee, Dr. Delgado, and Dr. Stein's Opinions (Dkt. No. 93) because they are not reliable and are irrelevant.

In sum, this court concludes that Mr. Lujan has failed to establish "'such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in Exide's reliance on Dr. Stein's opinion or that there is a triable issue of fact on the issue of pretext. *See Mickelson*, 460 F.3d at 1315 (quoting *Green*, 420 F.3d at 1192-93). Thus, the court grants Exide's motion for summary judgment on Mr. Lujan's workers compensation retaliation and FMLA retaliation claims.[2]

### B. FMLA Interference

Mr. Lujan's third claim is for FMLA interference. The FMLA permits qualified employees to take leave under defined circumstances, including the employee's own serious health condition. *See* 29 U.S.C. § 2612(a)(1)(D). "To establish an FMLA interference claim, Plaintiff must show: (1) that he was entitled to FMLA leave, (2) that some adverse action by the employer interfered with his right to take FMLA leave, and (3) that the employer's action was related to the exercise or attempted exercise of his FMLA rights." *Peterson v. Exide Technologies*, No. 09-4122, 2011 WL 677150, at *4 (D. Kan. Feb. 16, 2011) (citing *Metzler*, 464 F.3d 1164). The *McDonnell Douglas* burden-shifting analysis does not apply to FMLA interference claims. To the extent Mr. Lujan asserts a separate claim for "failure to restore," this court will treat it as an alternative FMLA interference claim. *See Tabares v. Gates Corp.*, No. 06-4140, 2009 WL 151571, at *1 n.1 (D. Kan. Jan. 21, 2009); *see also Metzler*, 464 F.3d at 1170.

Exide argues Mr. Lujan's FMLA interference claim fails because he exhausted his FMLA leave before it fired him. Under the FMLA, an employee is entitled to 12 weeks of leave during any

---

[2]Exide also advances a judicial estoppel argument similar to the one it raised previously in opposing Mr. Lujan's discovery request. Again this court finds the stipulation in the workers compensation award does not judicially estop Mr. Lujan from making the retaliation claims here. But, to the extent Mr. Lujan seeks to testify that he did not have permanent work restrictions or a permanent partial impairment to his left shoulder, he is judicially estopped from doing so.

12-month period. *See* 29 U.S.C. § 2612(a)(1). To be eligible for leave an employee must have been employed "(I) for at least 12 months by the employer [from] whom leave is requested . . . . and (ii) for at least 1,250 hours of service with such employer during the previous 12-month period." 29 U.S.C. § 2611(2)(A) (alterations added). Additionally, the employer may require FMLA leave to run concurrently with other leave. *See Ney v. Hoisington, Kan.*, 264 Fed. App'x 678, 680 n.1 (10th Cir. 2008); *Hill v. McHenry*, No. 99-2026, 2001 WL 238141, at *9 (D. Kan. Feb. 20, 2001); *see also* 29 C.F.R. § 825.207(a).

First, Mr. Lujan argues he did not exhaust his FMLA leave because Exide never gave him notice it was running his FMLA leave concurrently with his workers compensation leave. The Supreme Court, in *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002), addressed whether an employer's failure to provide notice rendered the time off uncountable toward FMLA leave. In *Ragsdale*, the employee missed 30 consecutive weeks of work. *Id.* at 85. When she exhausted her leave under the company's policy, it terminated her employment. *Id.* The plaintiff filed suit contending the 30 weeks off did not count as FMLA leave because the employer did not notify her that her previous absence counted as FMLA leave. *Id.* The regulation in effect at the time, 29 C.F.R. § 825.700(a), stated that "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." *Id.* at 88. The Court held that this "categorical penalty is incompatible with the FMLA's comprehensive remedial mechanism. . . . it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice." *Id.* at 89-90. Therefore, an employer's failure to notify an employee that leave is FMLA leave does not automatically entitle the employee to 12 additional weeks of FMLA

27

leave. The court must take into consideration whether the employee would have returned to work sooner had he known he was taking FMLA leave. *See id.*[3]

Under *Ragsdale*, this court must determine whether Exide's failure to give notice prejudiced Mr. Lujan, that is whether he would have acted differently had he known he was taking FMLA leave. Mr. Lujan cannot meet this burden. He has not and cannot show that he would have taken less leave had Exide notified him he was taking FMLA leave. Dr. Richards placed him on full work restrictions on February 20, 2007. Those restrictions were not removed, and Mr. Lujan was not cleared to return to work, until July 29, 2007.

Even if Mr. Lujan's FMLA leave did not run concurrently with the time he was off for shoulder surgery, he must still prove that Exide's decision to fire him was related to his exercise or attempt to exercise FMLA leave. *See Metzler*, 464 F.3d at 1180. An employee may be fired, preventing him from exercising FMLA rights, if the "dismissal would have occurred regardless of the employee's request for or taking FMLA leave." *Id.* Mr. Lujan cannot meet his burden to show his termination had anything to do with his exercise of FMLA rights. As noted above, Exide fired him because he had permanent work restrictions in place that were inconsistent with his job requirements.

Additionally, Mr. Lujan's FMLA interference claim fails because he has not shown that he worked the required number of hours in the preceding 12-month period—from March 13, 2007, to March 13, 2008. To qualify for FMLA leave, an individual must be employed for at least 12 months and provide the employer with at least 1,250 hours of service during the previous 12 months. *See* 29

---

[3]Current regulation 29 C.F.R. § 825.300(e) provides, "[f]ailure to follow the notice requirements . . . may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights."

U.S.C. § 2611(2)(A). Mr. Lujan presented no evidence that he provided 1,250 hours of service in the preceding 12-month period. He only argued the following in his response to Exide's statement of uncontroverted facts: "Controverted. From July 29, 2007 to March 13, 2008, Mr. Lujan worked for 33 weeks which at a 40 hour week is 1320 hours." Dkt. No. 89, at 37. Mr. Lujan offered no citation to the record to support this assertion. And facts unsupported by citations to the record are not presumed to be true. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995). Even if his unsupported statement were taken as true, his calculation does not include paid vacations, holidays, and sick leave, which do not count toward the 1,250 hours. *See Mondaine v. Am. Drug Stores, Inc.*, 408 F. Supp.2d 1169, 1205 n.44 (D. Kan. 2006) (citing Family and Medical Leave Act, 60 Fed. Reg. 2180, 2186 (1995)). Exide, however, presented the testimony of Ms. Cornish that "[a]fter Mr. Lujan returned to work after being on leave, he did not complete the 1,250 hours of service prior to the termination of his employment." Dkt. No. 85, Ex. 1, ¶ 47.[4] Therefore, Mr. Lujan's FMLA interference claim fails because he was not entitled to FMLA leave.

**IV. Motion to Exclude Plaintiff's Expert Witnesses**

On December 23, 2010, Mr. Lujan filed a discovery motion seeking to obtain videotape of certain Exide workers performing different jobs at Exide's Salina, Kansas plant. The jobs were the ones Ms. Cornish had evaluated in March 2008. Mr. Lujan argued he needed the video to show that he was physically capable of performing the jobs. Exide opposed the discovery on a number of

---

[4]Exide also presents two additional arguments against Mr. Lujan's interference claim, that his FMLA expired on October 21, 2007, because he had accepted light duty work for the previous 12 weeks, and that he was not eligible for FMLA leave because he did not have a serious health condition. Because this court has sustained Exide's motion for summary judgment for the above-noted reasons, it is unnecessary to consider these remaining arguments.

grounds. Ultimately, the Magistrate Judge and this court concluded that any motion to preclude the discovery was premature and ordered that Mr. Lujan be permitted to take no more than two hours of videotape at the plant. Exide allowed Mr. Lujan to access its plant on May 9, 2011, and directed his videographer, Karl Sneath, to the various workers. Mr. Lujan obtained about 50 minutes of footage. From this video, he edited it to 26 minutes and 43 seconds. He sent this edited footage to Dr. Satterlee, Dr. Stein, and Dr. Delgado.

Before analyzing the substance of the motion, it is important to note that Exide does not seek to exclude these doctors from testifying as Mr. Lujan's treating physicians or from offering evidence about facts they learned during the course of treating him. Mr. Lujan makes several references that Exide wishes to prohibit the doctors from testifying, but that misstates Exide's intentions. Exide asks only that the court preclude these three doctors from offering opinions in this case as retained experts based on their review of the video taken in May 2011. In its previous Order on defendant's Motion to Review the Magistrate's Discovery Order (Dkt. No. 60) the court stated the following:

> If plaintiff intends to use any treating physicians as designated experts to offer opinion testimony about the videotape evidence, he must do so within the parameters of Rule 26(a)(2). *See Wreath v. United States*, 161 F.R.D. 448, 450 (D. Kan. 1995) (stating "when the [treating] physician's proposed opinion testimony extends beyond the facts made known to him during the course of the care and treatment of the patient and the witness is specially retained to develop specific opinion testimony, he becomes subject to the provisions of Fed. R. Civ. P. 26(a)(2)(B)"). Rule 26(a)(2) requires a party to disclose the identity of its expert witness along with a written report prepared and signed by that witness which provides a statement of the opinions to be expressed by that witness, among other things. Such disclosures must also be supplemented in accordance with Rule 26(e).

*Id.* at 7-8.

Exide contends any expert testimony should be excluded because (1) Dr. Satterlee and Dr. Stein did not agree to be retained experts and Mr. Lujan did not provide the necessary information

under Fed. R. Civ. P. 26(a)(2)(B); and (2) the opinions of all three doctors fail to meet the *Daubert* standard of reliability and relevance.

### A. Mr. Lujan Complied with Rule 26(a)(2)(B)

Exide argues that Mr. Lujan did not comply with the expert disclosure rules regarding Dr. Satterlee and Dr. Stein's testimony as expert witnesses. First, Dr. Satterlee testified that he had not been retained as an expert in this case. *See* Dkt. No. 94, Ex. N, pg. 17. And he did not believe he was giving expert testimony regarding Mr. Lujan's ability to perform work. Additionally, Mr. Lujan has not provided an expert report for Dr. Satterlee in compliance with Fed. R. Civ. P. 26(a)(2)(B). The Rule provides in pertinent part, "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case . . . The report must contain . . . . a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." FED. R. CIV. P. 26(a)(2)(B). But the Tenth Circuit has held that in certain circumstances an expert may be relieved of the duty to file a report when the expert does not regularly give expert testimony. *Watson v. United States*, 485 F.3d 1100, 1107 (10th Cir. 2007). And Mr. Lujan's Response brief states that Dr. Satterlee does not regularly testify and does not keep a list of cases in which he has testified. Accepting that Dr. Satterlee does not regularly give testimony, this court finds he is not bound by the strict requirements of Rule 26(a)(2)(B). Further, the disclosures that have been provided for Dr. Satterlee give Exide sufficient notice of the opinions he would offer and the basis of those opinions. Therefore, the court will not exclude his testimony on the basis of a Rule 26(a)(2)(B) violation.

Dr. Stein also testified that he did not believe he was testifying for Mr. Lujan in an expert capacity. *See* Dkt. No. 94, Ex. P, pgs. 4-6. And Exide challenges the "report" provided by Dr. Stein as insufficient. A party seeking to present expert testimony must disclose a report containing, among other things, "(I) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them." FED. R. CIV. P. 26(a)(2)(B)(I)-(iii). The report provided by Dr. Stein states, in its entirety:

> **DISCUSSION**: I had a conference in the office today with attorney David Alegria regarding Mr. Lujan's ability to return to work at Exide. I had evaluated the patient on 1/11/08 with some followup notes through 2/27/08 and provided permanent work restrictions. For details see my report of 1/11/08. No restrictions were placed on the patient in regard to his neck. All restrictions were related to the shoulder. The attorney has indicated that Mr. Lujan wanted to return to work but the employer would not allow a return due to the restrictions.
>
> I reviewed a video which was purported to show the available jobs at Exide. Mr. Alegria stated that the patient has told him that he can do all of these jobs. It is also the case that the treating physician had released the patient without restrictions.
>
> It should be noted that I have not seen this individual since 2008 and the following statements would have been true at the time that I saw him. I believe that he was capable of doing the jobs seen. The job activity does not appear to be very much, if any, outside of the restrictions I placed. In this instance, I would defer to the treating physician, remove my restrictions, and allow Mr. Lujan to return to this work activity.

Dkt. No. 94, Ex. M. While this report may contain all of Dr. Stein's opinions and his basis for them generally, it does not include the facts or data considered by the witness in forming them. But Dr. Stein did reference his evaluation of Mr. Lujan and the video he reviewed and stated that he based his opinion primarily on those facts. Dr. Stein's notes and the video are both materials Mr. Lujan has disclosed to Exide. Although the report is bare, it meets the standard set out in Rule 26(a)(2)(B) and

provides Exide the nature of the opinion to be expressed by Dr. Stein and the basis of that opinion.

Thus, this court will not exclude Dr. Stein's opinion on the basis that Mr. Lujan failed to satisfy Rule

26.

Exide does not challenge Mr. Lujan's compliance with the expert disclosure rules as to Dr.

Delgado.

### B. Mr. Lujan's Putative Expert Opinions Are Unreliable and Irrelevant

Exide also contends the opinions of the three doctors based on viewing the videotape are

unreliable and irrelevant and should be excluded under *Daubert v. Merrell Dow Pharmaceuticals,*

*Inc.*, 509 U.S. 579 (1993). Under Fed. R. Evid. 702, the district court must perform a gatekeeping

function by determining the admissibility of scientific testimony. *See Daubert*, 509 U.S. at 594-95.

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if: (a) the expert's
> scientific, technical, or other specialized knowledge will help the trier of fact to
> understand the evidence or to determine a fact in issue; (b) the testimony is based on
> sufficient facts or data; (c) the testimony is the product of reliable principles and
> methods; and (d) the expert has reliably applied the principles and methods to the
> facts of the case.

*Id.* Mr. Lujan has the burden of establishing these admissibility requirements by a preponderance of

the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987). To fulfill its gatekeeping

role, the court must first determine whether the proffered testimony has "a reliable basis in the

knowledge and experience" of the relevant discipline. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227,

1232-33 (10th Cir. 2004). To make this determination the court should look into the qualifications

and background of the expert and ask if "'the reasoning or methodology underlying the testimony

is scientifically valid.'" *Id.* (quoting *Daubert*, 509 U.S. at 592-93). "'[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.'" *Mitchell v. Gencorp., Inc.*, 165 F.3d 778, 782 (10th Cir.1999) (quoting *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir. 1994)). "The law grants the trial judge broad latitude to determine" what are "reasonable measures of reliability." *Gilson v. Sirmons*, 520 F.3d 1196, 1241 (10th Cir. 2008). Second, the court must determine if the testimony is relevant. *Bitler*, 400 F.3d at 1234.

Exide generally argues that the video taken in May 2011, is not reliable or relevant because it does not accurately reflect the pertinent jobs as they existed in March 2008, when Mr. Lujan was fired. This objection is well founded because Mr. Lujan has not identified any evidence indicating the video accurately depicts the job functions as they existed in 2008. The only evidence he offers on this point is the affidavit of the videographer that states "[w]ith respect to each job, I taped until I was informed by Cornish and other plant employees that I had captured on tape all of the functions of each job." Dkt. No. 91, Ex. 1, ¶ 5. Even assuming this statement is true, it still fails to prove the taped jobs accurately depict the jobs as they existed in March 2008. Although likely not enough to preclude the testimony on its own, this undercuts the reliability and relevancy of the expert opinions from the outset.

### 1. The Proffered Opinions of Mr. Lujan's Experts Are Unreliable

The doctor's opinions based on the video are also unreliable for several other reasons. First, all three doctors testified they had no specific knowledge of the weight of the objects lifted in the videos and also that they did not review the job requirements for the jobs shown in the video. Dr. Delgado's testimony is representative:

Q.     And with respect to making an evaluation as to the other lifting restrictions that you imposed, it would be critical for you to know the weights of the items being depicted listed -- or lifted, correct?

A.     Yes.

Q.     And without knowing those weights, you really wouldn't be able to make a determination from the videotape alone as to whether or not the work depicted fit within these other weight restrictions?

A.     That is correct.

. . .

Q.     So offering an opinion about whether or not the work depicted on the videotape fit within the lifting restrictions of your report would just be speculation on your part?

A.     Correct.

Q.     And viewing the videotapes and offering any opinion about whether or not the work depicted in those tapes whether that fit within the work restrictions imposed by Dr. Stein, that would be pure speculation?

A.     Yes, that's true.

Dkt. No. 94, Ex. O, pgs. 61-63. Without knowing the weights of the objects or the job descriptions, it would be impossible for the doctors to provide reliable opinions about whether Mr. Lujan could perform work with the restrictions placed on him by Dr. Stein. Dr. Delgado went further and even testified he would have to speculate about whether the jobs in the video were consistent with Mr. Lujan's repetitive motion restrictions because the tape did not provide long enough segments of each job to make a proper determination.

Dr. Satterlee's opinion is further undercut because he treated Mr. Lujan for the last time in October 2007, five months before his termination. And he testified he had no knowledge of Mr. Lujan's condition in 2008. Thus, any opinion offered by Dr. Satterlee on Mr. Lujan's ability to

perform work in March 2008, would be speculative.

Dr. Stein's opinion is unreliable because his testimony that he would defer to the treating physician is based on a flawed premise. Dr. Stein indicated he would remove the restrictions he placed on Mr. Lujan because, as his report indicates, "the treating physician had released the patient without restrictions." Dkt. No. 94, Ex. M. This statement is incorrect. As noted above, Dr. Satterlee had not released Mr. Lujan without restrictions. Dr. Satterlee released Mr. Lujan with a 60 pound lifting restriction. And Dr. Stein admitted he reviewed the video without considering Dr. Satterlee's 60 pound restriction. So even if Dr. Stein would defer to Dr. Satterlee's opinion, his opinion is based on incorrect evidence.

In sum, the problems noted above with the doctors' opinions lead this court to conclude that any testimony based on the video would be unreliable. No evidence suggests the video accurately depicts the jobs as they existed in 2008, and none of the doctors knew how much the objects weighed when they considered whether Mr. Lujan could perform the jobs depicted. Additionally, Dr. Satterlee admitted he had not seen Mr. Lujan in the preceding five months before he was fired. And Dr. Stein's opinion was rendered without knowing Mr. Lujan was still under Dr. Satterlee's restriction.

### 2. Mr. Lujan's Putative Expert Opinions Are Not Relevant

More importantly, the opinions based on the video are irrelevant to the claims in this case. Reduced to a fine point, Mr. Lujan must produce enough evidence to call into question whether Exide honestly believed he could not perform his job as a COS Operator, not that he could in fact perform his job. *See Degraw*, 744 F. Supp.2d at 1211. The essential thrust of the putative expert opinions is whether Mr. Lujan could in fact perform his job—a fact that is relevant only to the extent

it calls into question Exide's honest belief in firing him. All three experts specifically testified that they had no opinion on the reasonableness of Exide's termination decision.  At best the doctors only gave an opinion about whether Mr. Lujan could perform the work depicted on the video based on their recollection of what his restrictions were in 2007 or 2008. And all three specifically testified they would have to speculate on his ability to perform the COS Operator job or other available jobs in 2008.

In total, the doctors' opinions, even if reliable, are only slightly relevant on Exide's intent in firing Mr. Lujan. Because the opinions are unreliable, they are even less relevant. Therefore, exercising its gatekeeping function under Fed. R. Evid. 702, this court finds the putative expert opinions of Dr. Satterlee, Dr. Stein, and Dr. Delgado are unreliable and irrelevant to the claims at issue. The court grants Exide's motion to exclude the opinions.


**V. Motion to Strike the Affidavit of Karl Sneath or, Alternatively, to Take Mr. Sneath's Deposition (Dkt. No. 91)**

Because the court finds that the expert opinions based on reviewing the video should be excluded, Exide's Motion to Strike Affidavit of Karl Sneath (Dkt. No. 91) is denied as moot.

IT IS ACCORDINGLY ORDERED this 6th day of February 2012, that Exide Technologies's Motion for Summary Judgment (Dkt. No. 84) is granted.

IT IS FURTHER ORDERED that Exide's Motion to Exclude Plaintiff's Expert Witnesses (Dkt. No. 93) is granted.

IT IS FURTHER ORDERED that Exide's Motion to Strike Affidavit of Karl Sneath or, Alternatively, to Take Mr. Sneath's Deposition (Dkt. No. 91) is denied as moot.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE